# In the United States Court of Federal Claims

No. 22-1521 C
Filed Under Seal: March 31, 2023
Reissued: April 19, 2023[*]

```
* * * * * * * * * * * * * * * * **
                                 *
DIGIFLIGHT, INC.,                *
                                 *
                     Plaintiff,  *
                                 *
         v.                      *
                                 *
THE UNITED STATES,               *
                                 *
                     Defendant,  *
                                 *
and                              *
                                 *
THE TOLLIVER GROUP, INC.,        *
                                 *
                Defendant-Intervenor. *
                                 *
   * * * * * * * * * * * * * * * * *
```

*Roderic G. Steakley*, Dentons Sirote, PC, with whom were *Benjamin R. Little*, Dentons Sirote, PC, of Huntsville, AL, and *Jerome S. Gabig*, Gabig Law Firm, of Guntersville, AL, for Plaintiff.

*Christopher L. Harlow*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, all of Washington, D.C., for Defendant, and *Major Brittney N. Montgomery*, Trial Attorney, Legal Service Agency, United States Army, of Fort Belvoir, VA, of counsel.

*W. Brad English*, Maynard, Cooper & Gale, PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, and *Nicholas P. Greer*, Maynard, Cooper & Gale, PC, all of Huntsville, AL, for Defendant-Intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.  In addition, the Court made minor typographical and stylistic corrections.

## OPINION AND ORDER

**SOMERS**, Judge.

On October 14, 2022, Plaintiff, DigiFlight, Inc., filed a complaint in this Court protesting the award of a task order to Defendant-Intervenor, The Tolliver Group, Inc., pursuant to Task Order Request for Quotations 2020P-03 ("RFQ"), for programmatic support for the United States Army Aviation and Missile Command ("AMCOM"). For the reasons that follow, the Court has determined that the Army, in evaluating quotations, committed prejudicial errors in conducting the price realism analysis it obligated itself to perform by the terms of the RFQ and in evaluating quotations under the technical expertise factor. Accordingly, for those counts of Plaintiff's complaint for which it has standing, Plaintiff is entitled to judgment on the administrative record, and Plaintiff's request for a permanent injunction is granted.

## BACKGROUND

### A.     The Solicitation

On December 1, 2021, the Army issued the RFQ seeking programmatic support services for AMCOM, including: "resource management; cost estimating/analysis and budget preparation; program management, plans, and integration; schedule development and assessment; systems analysis; strategic planning; risk analysis; and risk mitigation to the various offices and staffs within AMCOM." AR 112. The RFQ was conducted as a total small business set-aside, and exclusive to vendors who already had EXPRESS Blanket Purchase Agreements ("BPAs") with the General Services Administration ("GSA"). AR 113. Furthermore, the solicitation explicitly stated that it was a FAR subpart 8.4 procurement and "**not** a FAR Part 15 negotiated competition." AR 115.

According to the RFQ, the award would be made to the offeror "whose quotation provide[d] the best value to the Government . . . ." AR 123. It stated three evaluation criteria: Technical Expertise, Risk Mitigation and Management, and Price. AR 123–26. In addition, it detailed how the three factors would be weighed in relation to each other:

> The first two criteria, Technical Expertise, and Risk Mitigation and Management, are of equal importance, and each of them is of greater importance than Price. Price is not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease.

AR 123.

In addition, the RFQ described how each criterion would be evaluated, respectively. As to both Technical Expertise and Risk Mitigation and Management, the RFQ stated that ratings would be "based on how well the quotation demonstrates a clear understanding of the requirements and deliverables, and on the Offeror's expressed ability to successfully perform."

AR 124.  The RFQ specified four possible ratings, and included charts describing the standard associated with each rating level as summarized below:

| Technical Expertise/Risk Mitigation and Management Ratings | |
|---|---|
| Rating | Description |
| Outstanding | Quotation meets requirements and indicates an exceptional level of expertise and an understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| Good | Quotation meets requirements and indicates a thorough level of expertise and an understanding of the requirements.  Strengths outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Acceptable | Quotation meets requirements and indicates an adequate level of expertise and an understanding of the requirements. Strengths and Weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate. |
| Unacceptable | Quotation does not meet requirements and contains one or more deficiencies. If this criterion is rated as **Unacceptable**, additional factors will not be evaluated and the quotation is not eligible for award. |

*See* AR 124–26.

Specifically with regard to the Technical Expertise, the RFQ stated that a quotation "will be evaluated based on the degree to which it thoroughly demonstrates the Offeror understands the services to be delivered in order to meet the requirements of the [Performance Work Statement ("PWS")] and the Offeror's ability to perform those services." AR 124.  Moreover, "[w]hile award of this task order will require the Offeror to perform all of the PWS requirements, the Government considers the requirements in the following PWS paragraphs 3.1.3, 3.1.10, 3.1.11, 3.1.14, 3.1.15, 3.1.16, 3.1.17, 3.2.2, and 3.2.3 to be critical to evaluation of the Offeror's technical expertise." *Id.* (emphasis omitted).  Accordingly, the RFQ insisted that these requirements "be specifically addressed in the quotation." *Id.*

Finally, as to Price, the RFQ provided that "[t]he Government will use price analysis to determine the overall price reasonableness," AR 126, and that

[t]he government will assess the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation.  Unrealistic pricing will not be adjusted by the Government in its evaluations, but it reserves the right to reject a quotation upon a determination that a price is unrealistically low.  All direct labor hours, skill mix, and labor categories

in the Price Quotation must be consistent with the technical expertise and Risk Mitigation & Management portion of the quotation.

AR 127.

## B.  Award Decision

On January 31, 2022, three BPA holders submitted quotations in response to the RFQ: Plaintiff, Tolliver, and ███████████████████████.  AR 476.  On September 29, 2022, the Army informed the offerors that it had awarded the task order to Tolliver.  AR 562. In its evaluation, the Army purported to assess each quotation for Technical Expertise, Risk Mitigation and Management, and Price, and summarized the results using the following charts:

### DigiFlight EVALUATION RESULTS:

| FACTORS | DigiFlight |
| --- | --- |
| Technical Expertise | Acceptable |
| Risk Mitigation and Management | Good |
| Price | ████████████ |

AR 562;

### [Tolliver] EVALUATION RESULTS:

| FACTORS | TTGI |
| --- | --- |
| Technical Expertise | Acceptable |
| Risk Mitigation and Management | Acceptable |
| Price | $43,794,113.06 |

AR 567;

### ███  EVALUATION RESULTS:

| FACTORS | ████ |
| --- | --- |
| Technical Expertise | Acceptable |
| Risk Mitigation and Management | Acceptable |
| Price | ████████████ |

AR 573.

With regard to Technical Expertise, none of the three offerors received a single strength, weakness, or deficiency.  *See* AR 562, 567, 573.  As to Risk Mitigation and Management, Plaintiff received a single strength for "[b]ringing together the right team to perform the PWS requirements," and no weaknesses or deficiencies.  AR 563.  Both Tolliver and ███ received no strengths, weaknesses, or deficiencies for this factor.  AR 569, 574.

4

As to Price, the evaluators "reviewed the pricing received in response to th[e] solicitation to determine price reasonableness." AR 488. To do so, the evaluators compared the Independent Government Cost Estimate ("IGCE") rates to the prices proposed by the offerors. AR 486. The IGCE rates are "based on historical labor rates," and "represent the maximum rates, which incorporate national prices and industry wide concern." AR 488. The rates submitted by the offerors were discounted, which was allowable under the terms of the RFQ. *Id.*[1] The evaluators summarized their findings as follows:

> [i]n conducting the price evaluation, the government assessed the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation. The Contracting Officer reviewed the Offerors' labor categories, skill mix, and hours and found that all three Offerors proposed the appropriate education/experience levels in accordance with EXPRESS Labor Categories: Minimum Requirements Listing. DigiFlight, ███ and [Tolliver] all proposed labor hours that are consistent with the TORFQ. The Offerors' Task Order/Rate Table rates were evaluated to ensure that they were equal to or less than the established [GSA] rates. Since the TORFQ allowed Offerors to propose discounts, all Offerors provided discounts from their negotiated GSA schedule. The Government took no exceptions or issues to the Offerors' proposed pricing and found all three to be realistic for the work to be performed. Additionally, all three Offerors reflect a clear understanding of the requirements.

AR 489.

In addition, the evaluators had the following to say regarding their price realism analysis:

> [i]n further evaluating for price realism, the Government compared the two lowest composite rates offered by ███ and [Tolliver]. While both companies offered composite rates well below the IGCE composite rates, the Government found that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award. Since DigiFlight offered a composite rate far higher than the two lowest Offerors, it was determined that DigiFlight did not offer an unrealistically low price for the purpose of receiving award either. Further, the Government used the GSA Contract Awarded Labor Categories (CALC) tool to substantiate a random sample of labor category prices offered by all three Offerors. All offered labor category prices were well within the acceptable range. Based upon this analysis, the Government determined that all Offerors' prices are realistic.

*Id.*

The evaluators also assessed the labor mix for all three bidders, using exactly the same language to summarize each respective evaluation:

---

[1] Despite the RFQ clearly requiring a price realism analysis, the evaluators still stated that "the TORFQ does not limit the amount of discount an offeror may propose." AR 488.

A review of the basis of estimate was done and the level of effort and mix of labor proposed to perform the tasks outlined in the PWS reflects understanding of the requirements, is consistent with the various elements of the other parts of the quotation and is considered realistic to support the proposed approach at an acceptable level of risk to the Government.  Overall, [██ DigiFlight/Tolliver]'s [Basis of Estimate] appears appropriate and reasonable to perform the tasks outlined in the PWS.

AR 489–90.

The Army then conducted a trade-off analysis by balancing the Technical Expertise ratings, the Risk Mitigation and Management factor ratings, and Price.  Because the Technical Expertise ratings were all the same and Plaintiff—despite its one strength in the Risk Mitigation and Management factor—was more costly than Tolliver, "the Contracting Officer determined that [Tolliver] provide[d] the best-value to the Government."  *See* AR 495–96.

## DISCUSSION

### A.  Jurisdiction and Standing

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  In order to come within this jurisdictional grant, a protestor must demonstrate that it has standing.  *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].").  To establish standing in a bid protest case, the protestor must show that it is an "interested party" under 28 U.S.C. § 1491(b)(1), "which . . . imposes more stringent standing requirements than Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  Under § 1491(b)(1), a party must show that it "(1) is an actual or prospective bidder and (2) possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In a post-award bid protest, an offeror has a "direct economic interest" if it can demonstrate that "there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

In addition, while neither the government nor the Defendant-Intervenor have directly challenged Plaintiffs' standing to bring the instant protest, the Court has an independent duty to ensure that it has jurisdiction over the matter.  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.") (citing cases); *see also* Rule 12(h)(3) of the Rules of the

United States Court of Federal Claims.  Plaintiff is clearly an actual bidder in this procurement. However, whether Plaintiff has established a "direct economic interest" in the resolution of each error it alleges shall be assessed with respect to each individual claim.[2]

## B.  Legal Standard

If a protestor establishes that it has standing, this Court has authority to review the agency's decision under the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *see also* 5 U.S.C. § 706.  The Federal Circuit has defined a two-part test to determine the merits of a bid protest under the APA standard.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the protestor is required to show that the agency action in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Accordingly, this prong of the test is satisfied if either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Second, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  To establish that it has suffered a prejudicial error in a post-award protest, a plaintiff is "required to show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum*, 404 F.3d at 1358 (citations omitted).

Moreover, in reviewing an agency's procurement decisions, the Court's task is not to "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *see also Weeks Marine, Inc.*, 575 F.3d at 1368–69 (stating that under "'highly deferential' rational basis review," courts will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'" (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000))).  Rather, the protestor "bears a heavy burden," and the agency is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations omitted).  Nonetheless, the APA requires the Court to intervene in cases in which agency action is unreasonable.  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citation omitted).  "This standard requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).  Thus, the Court must use the evidence in the record to determine "whether the decision was based on the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416.

Finally, bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, which requires the Court to "make factual findings from the record evidence as if it were

---

[2] The Court has determined that Plaintiff has failed to meet its burden to demonstrate it has standing to protest two of the five counts in its complaint.  The Court will specifically address the lack of standing for these two counts below.

conducting a trial on the record." *Bannum*, 404 F.3d at 1354.  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56.  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

## C.  Analysis

### 1.  The Agency's Price Realism Analysis was Irrational

In general, a price realism analysis examines whether an offeror's prices are unrealistically low for the work to be performed.  Thus, a price realism analysis is performed to ensure that an offeror's proposed prices are not so low that contract performance is put at risk or that they evidence a lack of understanding of the solicitation's requirements.  Although the FAR does not require an agency to conduct a price realism analysis in procurements for fixed-price contracts, an agency may nonetheless obligate itself to perform one by the terms of its solicitation.  *See ViON Corp. v. United States*, 122 Fed. Cl. 559, 573 (2015) (holding that a solicitation stating that "[t]he Government *may* reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates" was enough to "commit[] the agency to conducting a price realism analysis"); *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 404 (2015) ("[T]he only reason any consideration of realism is necessary is the language in the RFP stating that unrealistically low offers *may* be eliminated." (emphasis added)); *FCN, Inc. v. United States,* 115 Fed. Cl. 335, 376 (2014) ("Because a price realism analysis was contemplated by the Solicitation, one had to be conducted, as the Solicitation stated that unrealistically low offers 'may be considered unacceptable and rejected on that basis.'" (internal citation omitted)).  In conducting a realism analysis, including a price realism analysis, "agencies enjoy wide latitude." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020); *see also A-T Sols., Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015) ("As cost realism determinations are within an agency's sound discretion and expertise, the Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision." (internal quotation omitted)).[3]  In other words, the methodology employed in a price realism analysis is largely left to the discretion of the agency in instances in which it does not commit itself to a particular methodology in the solicitation.  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009).  However, whatever methodology the agency chooses to employ must be reasonable.  *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) ("While an agency's cost realism analysis need not have been performed with 'impeccable rigor' to be rational, the analysis must reflect that the agency considered the information available and did not make 'irrational assumptions or critical miscalculations.'" (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000))).

Here, the evaluation criteria in the RFQ clearly committed the agency to conduct a price realism analysis: "[t]he government will assess the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and

---

[3] *Agile Defense* and *A-T Solutions* both addressed cost realism, but the wide agency latitude discussed in those cases is equally applicable in the price realism context.

is consistent with the various elements of the other parts of the quotation." AR 127. The agency did not further commit itself to a specific methodology for conducting the analysis; therefore, it enjoyed discretion in conducting a price realism analysis so long as it *reasonably* considered whether the offerors' proposed pricing: 1) was "realistic for the work to be performed"; 2) "reflect[ed] a clear understanding of the requirements"; and 3) was "consistent with the various elements of the other parts of the quotation." *Id.* While the agency appears to have conducted a rational price *reasonableness* analysis, as is explained below, its price *realism* analysis was not conducted in a rational manner.

The agency's price realism analysis, at least as documented in the administrative record, essentially consisted of a set of conclusory and repetitive statements with very little explanation or documentation of what, if anything, was actually done to complete this requirement. For instance, the price evaluation section of the source selection decision, which intermixes both the reasonableness and realism components, states that "[i]n conducting the price evaluation, the government assessed the price quotation to ensure the proposed pricing is realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the various elements of the other parts of the quotation." AR 489. Fair enough, but this statement simply restates the requirements of the price realism analysis the agency committed itself to conduct and then, in conclusory fashion, states the agency did in fact conduct such an analysis. The analysis then reiterates this same conclusion, that "[t]he Government took no exceptions or issues to the Offerors' proposed pricing and found all three to be realistic for the work to be performed. Additionally, all three Offerors reflect a clear understanding of the requirements." *Id.* The Court is left to wonder where the actual analysis is.

Reading on, the Court finally comes across some level of explanation as to why the agency concluded that the offerors' proposed prices were realistic. It appears that the realism determination was based on three factors. First, "the Government compared the two lowest composite rates offered by ███ and [Tolliver]," and "found that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award." *Id.* Second, "the Government used the GSA Contract Awarded Labor Categories (CALC) tool to substantiate a random sample of labor category prices offered by all three Offerors," and found that "[a]ll offered labor category prices were well within the acceptable range." *Id.* "Based upon this analysis, the Government determined that all Offerors' prices [we]re realistic." *Id.* Finally, after concluding that "all Offerors' prices [we]re realistic[,]" the agency, explains (using identical language for all three offerors) that it also examined the level of effort and mix of labor for all three offerors and concluded that the effort and labor mix "proposed to perform the tasks outlined in the PWS reflects understanding of the requirements, is consistent with the various elements of the other parts of the quotation and is considered realistic to support the proposed approach at an acceptable level of risk to the Government." AR 489–91 (repeating the language verbatim for each offeror). As explained below, the Court finds all three of these conclusions, at least to the extent they are documented in the administrative record, to be unreasonable.

a. *The agency's conclusion that two offerors would not propose unrealistically low prices is irrational*

In its MJAR, Plaintiff asks the Court to examine the reasonableness of the Army's conclusion that while both ██ and Tolliver "offered composite rates well below the IGCE composite rates, the Government found that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award." ECF No. 29 ("Pl.'s MJAR") at 12 (citing AR 489). Plaintiff argues that this conclusion from the Army's source selection decision is "predicated on false logic." *Id.* at 13. Specifically, Plaintiff takes issue with the conclusion that it would be "inconceivable" that two offerors would "offer unrealistically low prices as a strategy to receive the award." *Id.* According to Plaintiff, this line of reasoning "entirely failed to consider an important aspect of the problem," which is the possibility that "both Tolliver and ██ proposed unrealistic prices." *Id.*

Although the Court is not in a position to determine whether the prices quoted by Tolliver and ██ were, in fact, unrealistically low, there is no doubt that the agency's conclusion that they were realistic was predicated on an irrational assumption. The conclusion that it would be "inconceivable" that both Tolliver and ██ would underbid a contract lacks any rational basis. Surely, it is conceivable that two companies—competing for award—would have similar motivations for lowering the price of their quotations, even to the point of offering unrealistically low prices. Why is it that one company would bid an unrealistically low price (hence the whole reason for a price realism analysis), but two offerors would not? Is it not possible that two offerors could have underestimated the work required, not understood the requirements, or for some reason saw some value in this contract that made it worth underbidding? There may be some explanation for the agency's conclusion that no two offerors would underbid a contract— the Court cannot conceive of one—but to any extent there is, such an explanation is not found in the administrative record. And, without any explanation in the administrative record as to why this seemingly irrational conclusion is, in fact, rational in this case, the Court cannot find that this conclusion is reasonable. This conclusion, therefore, does not support a finding that the agency conducted a rational price realism analysis as was required by the RFQ.

Moreover, the Court must mention that the government entirely *failed* to respond to Plaintiff's argument on this point in its cross-motion, which constitutes waiver. *See, e.g., Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."). When questioned about this by the Court at oral argument, the government could only cite a case mentioned solely in its Reply brief. Oral Argument at 6:30–14:20; *see also* ECF No. 38 ("Gov.'s Reply") at 7 (citing *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 358). That case—*Afghan American Army Services Corp. v. United States*—is of little, if any, help to the government on this point[4] and, even if it were

---

[4] In *Afghan American Army Services*, Judge George Miller found that a price realism analysis can be accomplished by "comparison of the prices received with each other" in a case in which the price comparisons involved evaluating the prices of *twenty-one* offerors *and* the independent government estimate. 90 Fed. Cl. at 358 (internal quotation omitted). Judge Miller nonetheless found the price realism analysis was irrational because it was based on a flawed independent government estimate. Thus,

helpful, waiting to respond to an argument for the first time in a reply brief is not sufficient to preserve a response. *See Novosteel SA v. U.S.*, *Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

Despite the government's failure to respond to Plaintiff's argument, Defendant-Intervenor was able to preserve a response to Plaintiff's argument on this point; however, the government's good fortune is short-lived because Defendant-Intervenor's argument is unconvincing. Defendant-Intervenor cites *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 542 (2013), for the proposition that comparing prices between offerors is "one of the allowable methods to test [price] realism." ECF No. 32 ("Def-Int.'s MJAR") at 9. What Defendant-Intervenor fails to grasp is that Plaintiff's argument does not rely on an assertion that comparing prices is a *per se* unacceptable method of evaluating price realism. Rather, what Plaintiff challenges is the irrational application of that methodology in this case. Thus, a simple assertion that comparing offerors' prices is an acceptable method for conducting a price realism analysis is largely non-responsive to Plaintiff's argument and does nothing to bolster the agency's irrational conclusion. Again, a method itself not only needs to be rational, but the *application* of that method must be rational as well. One needs to look no further than the opinion in *Mil-Mar Century Corp.* to understand the unreasonableness of the agency's conclusion in this case. In *Mil-Mar Century Corp.*, the agency did far more than just look at two sets of pricing proposals and conclude that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award. Instead, in *Mil-Mar Century Corp.*, "the Agency compared [the awardee's] estimated material costs to those of the other offerors and the IGCE, evaluated [the awardee's] estimated prices of the engine, tank and frame, and compared [the awardee's] proposed labor hours to those of the other offerors." 111 Fed. Cl. at 542 (internal citations omitted). Simply put, the apparently thorough price realism analysis in *Mil-Mar Century Corp.* does not compare to the conclusory one conducted here, especially considering the irrationality of the conclusion drawn by the agency.

### b. There is insufficient documentation in the record for the Court to review the reasonableness of the agency's use of the CALC tool

Plaintiff further alleges that the agency's use of the GSA Contract Awarded Labor Categories ("CALC") tool was not properly documented to be considered a sufficient method of evaluating price realism. Pl.'s MJAR at 14. In its source selection decision, the agency stated

---

citation to a case in which the comparison involved the prices of twenty-one offerors is of little value to this case in which the contracting officer compared the prices of two offerors and ignored the fact that both the third offeror's price and the government estimate were much higher. But more importantly, as will be discussed below in addressing Defendant-Intervenor's argument regarding *Mil-Mar Century Corp.*, Plaintiff is not questioning the general proposition that price comparison may be an acceptable method of conducting a price realism analysis; rather, Plaintiff is questioning the rationality of the conclusion that "multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award." Pl.'s MJAR 12–13 (citing AR 489).

that the CALC tool was employed "to substantiate a random sample of labor category prices offered by all three Offerors," and it determined that "[a]ll offered labor category prices were well within the acceptable range." AR 489. However, Plaintiff points out that "there is no documentation in the record as to the supposed use of a CA[LC] tool." Pl.'s MJAR at 14. "Absent such documentation there is no basis to determine if the use of the CALC tool rationally supports a price realism analysis." *Id.*

Yet again, the government *failed* to provide any response to Plaintiff's contention—and, this time, neither did Defendant-Intervenor. Instead, the government chose to rely on the assertion that this was a FAR subpart 8.4 procurement and, therefore, "[t]he amount of documentation required . . . is far less than that required by FAR [Part] 15." ECF No. 31 ("Gov.'s Cross MJAR") at 6 (citing *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 270 (2019), *aff'd*, 829 F. App'x 518 (Fed. Cir. 2020)). However, it is well established that although FAR subpart 8.4 does require minimal documentation, "[a]n agency [still] must articulate a satisfactory explanation for an action to permit effective judicial review." *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 652 (2014) (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005)).

Initially, it should be noted that the Court takes no issue with the agency's utilization of the CALC tool as a method of evaluating price realism. The government devotes large segments of its brief defending the integrity and usefulness of the CALC tool. *See* Gov.'s Cross MJAR 7–9. As the government explains, the CALC tool is a "publicly-available pricing tool," which "allows vendors and Government officials to review position-specific hourly rates for contracts awarded under GSA Multiple Award Schedule (MAS) contracts, such as the EXPRESS Program BPA." *Id.* at 7. "Based on GSA Special Item Numbers (SIN), the CALC tool generates, a comprehensive list and a corresponding graph of awarded rates for the requested position, and calculates the average awarded rate, along with the 'statistical market range.'" *Id.* The government defines the "statistical market range" as including "roughly 70%" of the prices awarded or "plus or minus 1 standard deviation from the mean." *Id.*

However, while this Court is inclined to agree that use of the CALC tool *could* be an effective method of evaluating price realism, the issue here is that without documentation in the administrative record, there is no way to know whether the CALC tool *was utilized* reasonably. First, the Court cannot discern whether the agency employed a statistically significant random sample of offerors' proposed prices. How large was the sample? Which price categories were run through the CALC tool? Second, the contracting officer does not specify the threshold that was used to evaluate the sampling for price realism. The decision simply states that "prices were well within the acceptable range," AR 489, but nowhere in the administrative record is there an explanation or definition of what constitutes the "acceptable range." Without this minimal amount of documentation, the Court is unable to effectively review whether the contracting officer's use of the CALC tool was a reasonable method for evaluating price realism.

What is more, in an attempt to demonstrate to the Court how the CALC tool can be utilized to effectively evaluate price realism, the government included in its cross-motion tables showing the results of running three of the required labor categories through the CALC tool. Gov.'s MJAR at 8. The government does not represent that these three labor categories were the

same ones that the agency used in its "random sample of labor category prices"; however, unfortunately for the government, in one of the three labor categories for which it chose to supply demonstrative CALC tool graphs—program manager—the results show that one of the supposedly realistic proposed prices is actually unrealistic according to the government's own argument. Gov.'s MJAR at 8. According to the government's briefing, "acceptable range" means one standard deviation from the historical awarded rate. *See* Gov.'s MJAR at 7–8. For program manager, the low on this range is $111. *Id*. at 8. Based on the government's delineation of the "acceptable range" in its briefing, a proposed labor rate that is at or above $111 is realistic and one that falls below $111 would be unrealistic. The problem for the government is that the program manager price proposed by ███ is $110.63. AR 391. The agency determined that ███ prices were realistic, yet the government's own argument here shows that, at least for the program manager position, the price proposed was unrealistic. This is not to say that ███ prices were or were not realistic; rather, the Court simply points out the unreasonableness of the agency's use of a "random sample of labor category prices" with absolutely no explanation or documentation.

### c. The agency's conclusion that "all three Offerors reflect a **clear** *understanding of the requirements*" is unsupported by the administrative record

The agency's price realism analysis language required it to determine, *inter alia*, that the proposed prices "reflect[ed] a *clear* understanding of the requirements." AR 127 (emphasis added). The agency did determine that "all three Offerors reflect a *clear* understanding of the requirements." AR 489. This finding, however, appears to be by *ipse dixit*. Nowhere else in the evaluation are the offerors' *clear* understandings reflected. In fact, in the technical expertise evaluation, the evaluators determined that all three offerors had an "adequate" or "acceptable" level of understanding of the requirements. For all three offerors, the evaluators concluded that

> The Offeror's quotation indicates an *adequate understanding* of the PWS requirements and deliverables for a rating of "ACCEPTABLE". . . . The overall knowledge and experience communicated by the Offeror demonstrates they have *adequate knowledge* necessary to successfully perform the requirements in the critical PWS paragraphs. . . . In summary, the Offeror's quotation indicates an overall *acceptable level of understanding* of the PWS requirements. Based on the Offeror's technical methodology as presented, they have *adequate knowledge* to provide the services stated in the PWS and exhibit "ACCEPTABLE" technical capabilities with moderate risk of unsuccessful performance to the Government.

AR 443, 451, 457 (emphasis added). In addition, all three offerors were rated "acceptable" on their technical expertise. AR 492. The rating of "acceptable" meant that an offeror had "an adequate level of expertise and an understanding of the requirements." AR 124. In other words, the acceptable rating only documents that an offeror had "an understanding" versus "a clear understanding" of the requirements.

However, without explanation, in the price evaluation section of the source selection decision, the offerors are all found to have a "clear understanding of the requirements." AR 489. This may be the case, but it is not documented in the administrative record. Instead, it appears

airdropped in when needed to satisfy the requirements of the price realism analysis the agency committed itself to conducting. The agency was not permitted to reach this conclusion without some rationale as to why the offerors all had a clear understanding of the requirements, especially considering the only documentation of the offerors' understanding of the requirements is that their understanding was adequate or acceptable, not clear.

### d. The agency's conclusory analysis regarding level of effort and mix of labor appears to be untethered to price

Finally, after concluding that "all Offerors' prices [we]re realistic[,]" the agency explains (using identical language for all three offerors) that it also examined the level of effort and mix of labor for all three offerors and concluded that the effort and labor mix "proposed to perform the tasks outlined in the PWS reflects understanding of the requirements, is consistent with the various elements of the other parts of the quotation and is considered realistic to support the proposed approach at an acceptable level of risk to the Government." AR 489–91 (repeating the language verbatim for each offeror). It may be that the level of effort and labor mix, in and of themselves, were reasonable for the requirements of the RFQ, but to conclude—divorced from price—that this means the prices proposed were realistic, is an irrational conclusion. Essentially the agency conducted step one in a two-step analysis. Yes, it is important that, for instance, the number of hours proposed to conduct a task meets the agency's estimates for the required number of hours. But the number of hours proposed tells one little about the realism of the proposed price if the hourly rate is not considered as part of that analysis. If, for example, the going rate for a program manager is $150 per hour, and it is reasonably estimated that the program manager will work 1,000 hours a year (thus $150,000 in total yearly compensation), the fact that an offeror estimates that the program manager will work 1,000 hours means little in terms of price realism if the offeror proposes a $75 per hour rate for the program manager position.

Simply put, it was unreasonable for the agency to conclude, based on level of effort and labor mix alone (without considering price), that that all three offerors' proposed prices were realistic, *i.e.*, that they are "realistic for the work to be performed, reflect[] a clear understanding of the requirements, and [are] consistent with the various elements of the other parts of the quotation." AR 489.

### e. Plaintiff was prejudiced by the failure to conduct a rational price realism analysis

First, it has been repeatedly held that an agency's failure to conduct a required price analysis is a prejudicial error in and of itself, constituting a "significant . . . error in the procurement process." *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 516 (2003) (quoting *Alfa Laval Separation, Inc.*, 175 F.3d at 1367); *Active Network, LLC v. United States*, 130 Fed. Cl. 421, 429 (2017) ("Without a price realism analysis in the record, the Court has nothing to review and no way of determining whether [the protestor] was prejudiced. This conclusion alone is sufficient to warrant remand to conduct a proper price realism analysis."); *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 409 (2021) ("Therefore, this Court agrees with the *Al Ghanim* and *Green Tech.* line of cases and

14

concludes that Plaintiff has adequately shown prejudice from the Navy's failure to perform an unbalanced pricing analysis."). In this case, as was explained above, the agency was required to perform a price realism analysis under the terms of the RFQ and failed to do so in a manner that was rational (at least as can be observed by the documentation in the administrative record). Thus, under the above line of cases, this failure alone would be sufficient to show prejudice.

But even leaving this line of cases aside, the prejudice here is obvious. The award decision in this case came down to price:

> Beyond the mere adjectival ratings, the Contracting Officer found there was no functional differences between the approaches offered by [Tolliver and ▮]. Therefore, in accordance with the evaluation criteria, the importance of price increased when performing the trade-off analysis. With price increased in importance, the Contracting Officer found that [Tolliver] offered a better value because its price is nearly $1 million dollars lower than ▮/RTC's price and there was no identifiable advantage to justify paying this price premium. Therefore, between these two offerors, the Contracting Officer determined that [Tolliver] offered the better value for the Government. . . .

> Both [Tolliver and Digiflight] received identical adjectival ratings in the Technical Factor. Beyond the mere adjectival ratings, the Contracting Officer found no functional differences between the technical approaches of both companies. However, in the Risk Mitigation and Management factor, DigiFlight offered a slight advantage over [Tolliver] due to the strength assigned to DigiFlight. The Contracting Officer then compared the prices offered by both companies and determined that [Tolliver] offered a much lower price than DigiFlight. . . . The only advantage offered by DigiFlight concerns the particular subcontractors DigiFlight plans to employ for this task. . . . [T]he strength assigned only applies to one of those concerns and does not justify paying a roughly $16 million price premium. Therefore, the Contracting Officer determined that [Tolliver] provides the best-value to the Government.

AR 495–96. In short, price was the deciding factor.

Given that price was the deciding factor and that Plaintiff's allegation is that the prices of the other offerors were unrealistically low compared to the prices it proposed (which were determined to be both reasonable and realistic), *if* Plaintiff is correct that the other offerors' prices were unrealistic (an analysis that the agency did not rationally undertake), Plaintiff would have a not insubstantial chance of award once those offerors are either eliminated from competition for proposing unrealistic prices or have their prices adjusted upwards to realistic levels. Accordingly, although the Court does not know what the outcome of a rational price realism analysis would be, certainly it is possible that the price differential that resulted in Tolliver being awarded the contract over Plaintiff could change if a proper price realism analysis is conducted. Therefore, Plaintiff was prejudiced by the error.

## 2.   Plaintiff Lacks Standing to Challenge Whether the Agency Complied with FAR § 52.222-46

Plaintiff next alleges that the Army failed to comply with FAR § 52.222-46.  That regulation—if applicable[5]—would require each offeror to submit a "total compensation plan" along with its proposal, "setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract."  48 C.F.R. § 52.222-46(a).  It would also require the contracting agency to "evaluate the plan[s] to assure that [they] reflect[] a sound management approach and understanding of the contract requirements."  *Id.*  Plaintiff alleges that the agency never performed such an assessment.

As a threshold matter, Plaintiff lacks standing to bring such a challenge.  First, Plaintiff failed to plead in its complaint how the Army's alleged failure to comply with the regulation prejudiced it in any way.[6]  For example, a well-pled complaint would likely contain an allegation that Plaintiff proposed higher prices in its price proposal to account for the professional compensation levels it believed a proposal would need to meet in order to survive analysis under FAR § 52.222-46; however, such an allegation, or something similar, appears nowhere in Plaintiff's complaint.[7]  Second, Plaintiff fails to allege in its complaint that the RFQ even required the "meaningful numbers of professional employees necessary" for FAR § 52.222-46 to apply in the first place.  *See* 48 C.F.R. § 22.1103.  FAR § 52.222-46 only applies to contracts that meet the standards of FAR § 22.1103, which requires that 1) the contract amount be "expected to exceed $750,000" and 2) the "services are to be provided which will require meaningful numbers of professional employees."  *Id.*  While it is clear from the complaint that the contract amount was certainly expected to well-exceed $750,000, an allegation that the RFQ met the meaningful number of professional employees' requirement is nowhere to be found.  These two pleading insufficiencies require the Court to dispense of this argument before even considering its merit. *Castle*, 301 F.3d at 1337 ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination.").

Moreover, even if Plaintiff's theory were sufficiently pleaded and meritorious, Plaintiff waived its right to bring such a claim here by failing to object to the non-inclusion of FAR § 52.222-46 as part of the evaluation criteria prior to the conclusion of the bidding process.  According to Federal Circuit precedent, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the

---

[5] FAR § 22.1103 requires the inclusion of FAR § 52.222-46 "in solicitations for negotiated contracts when the contract amount is expected to exceed $750,000 and services are to be provided which will require meaningful numbers of professional employees."  48 C.F.R. § 22.1103.

[6] At oral argument, Plaintiff even conceded that it did not plead in the complaint that the alleged violation impacted its bid.  Oral Argument at 1:14:08.

[7] Plaintiff does make a statement that would have likely been sufficient for standing purposes in its MJAR had that statement been made in its complaint: "DigiFlight relied upon FAR § 5.222-46(c) that the 'Government is concerned with the quality and stability of the work force to be employed on this contract.'  In so doing, DigiFlight did not radically cut professional wage rates in order to be more competitive for award."  Pl.'s MJAR at 22.  Unfortunately for Plaintiff, an allegation like this needed to be in its complaint in order to meet its standing burden.  Even had Plaintiff met its standing burden, however, this bare allegation in its MJAR would not have been sufficient on the merits to meet its burden of proof of demonstrating merits prejudice.

bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). If Plaintiff were correct that FAR § 52.222-46 applied to this RFQ, the agency's failure to include FAR § 52.222-46 in the RFQ would have been obvious, because the agency never asked Plaintiff to submit, nor did Plaintiff's offer contain, a total compensation plan—as would be required by FAR § 52.222-46 if it applied. *See generally* AR 191–270. This is not some minor undertaking that could have been missed and thus would not have been obvious to Plaintiff. To comply with FAR § 52.222-46, Plaintiff would have needed to provide: "a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract . . . [and] [s]upporting information [] includ[ing] data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure." 48 C.F.R. § 52.222-46; *see also* 48 C.F.R. § 22.1103 (same). Plaintiff had to be aware that it was not providing this information and that, accordingly, the agency did not consider FAR § 52.222-46 to be applicable. Therefore, even if Plaintiff had standing to raise this claim, under *Blue & Gold*, Plaintiff waived any objection to a FAR § 52.222-46 violation by failing to raise the issue prior to the close of bidding.

Finally, even if Plaintiff had demonstrated that it has standing and that *Blue & Gold* was inapplicable, Plaintiff would still be unable to demonstrate merits prejudice here because it benefited from the same alleged error as the awardee did. As pointed out above with regard to its obligations under *Blue & Gold*, Plaintiff itself did not submit a total compensation plan as would be required by FAR § 52.222-46 if that provision applied to this procurement. "There has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited." *G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022), *appeal dismissed*, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023).

### 3. The Agency Erred by Essentially Converting a Best Value Procurement into a Lowest Price Technically Acceptable Procurement

In its complaint, Plaintiff alleges that "by not evaluating the proposals for strengths, the evaluators converted a best value procurement to a technically acceptable low-price procurement." ECF Nos. 1, 28 ("Compl.") ¶ 1.[8] The evaluation criteria stated that the award "will be made to the Offeror whose quotation provides the best value to the Government based upon evaluation of all submitted quotations using the criteria below and a tradeoff process." AR 123. As stated above, the three criteria were to be weighed as follows: "Technical Expertise, and Risk Mitigation and Management, are of equal importance, and each of them is of greater importance than Price." *Id.* Furthermore, the evaluation criteria provided that while "[p]rice is not expected to be the controlling criterion in the selection," "its importance will increase as the differences between the evaluation results for the other criteria decrease." *Id.* In addition, regarding how the proposals were to be evaluated for Technical Expertise, the RFQ explicitly

---

[8] Plaintiff filed its complaint on October 14, 2022, ECF No. 1, and filed an amended complaint on November 30, 2022, ECF No. 28. That amended complaint, however, merely added an additional count (Count V) to the original complaint. It did not restate paragraphs 1–52 of the original complaint or the prayer for relief. Accordingly, the citations to the complaint throughout will only refer to one complaint.

noted that "the Government considers the requirements in the following PWS paragraphs 3.1.3, 3.1.10, 3.1.11, 3.1.14, 3.1.15, 3.1.16, 3.1.17, 3.2.2, and 3.2.3 to be critical."  AR 124 (emphasis omitted).

Plaintiff challenges the agency's evaluation of Technical Expertise, claiming that "the evaluators only assessed if the proposals were technically acceptable without seeking to differentiate among the proposals."  Pl.'s MJAR at 24.  Specifically, Plaintiff points to the source selection decision, in which "for the evaluation criteria of Technical Expertise, all three proposals were identically evaluated," and all were awarded zero strengths, zero weaknesses, and zero deficiencies.  *Id.*  Moreover, Plaintiff asserts that "there is no separate analysis of differences among the proposals as to PWS paragraphs 3.1.3, 3.1.10, 3.1.11, 3.1.14, 3.1.15, 3.1.16, 3.1.17, 3.2.2, and 3.2.3."  *Id.*  Although Plaintiff admits that "it is possible that the proposals for technical expertise of the three offerors did not contain a single strength or weakness," Plaintiff still contends that such a "remote possibility cannot withstand scrutiny when examined against the facts."  *Id.* at 25.

Rather, according to Plaintiff, this case is factually similar to the Government Accountability Office's ("GAO") decision in *Systems Research and Applications Corporation; Booz Allen Hamilton, Inc.*, B-299818, 2007 WL 4867939 (Comp. Gen. Sept. 6, 2007).  In that case, GAO sustained a protest because "the record evidence[d] that the agency did not evaluate the proposals . . . in a way that reasonably distinguished their relative merits in accordance with the RFP's evaluation scheme."  *Id.* at *20.  According to GAO,

> [w]here, as here, the RFP states a best value evaluation plan—as opposed to selection of the lowest priced, technically acceptable offer—evaluation of proposals is not limited to determining whether a proposal is merely technically acceptable; rather, proposals should be further differentiated to distinguish their relative quality under each stated evaluation factor by considering the degree to which technically acceptable proposals exceed the stated minimum requirements or will better satisfy the agency's needs.

*Id.* at *19.

In response (to the extent it can be characterized as such), the government largely ignores Plaintiff's arguments and essentially asserts two things: 1) that Plaintiff did not prove it was prejudiced by the alleged failure to properly evaluate the proposals for their technical merit; and 2) that lack of documentation in the record that Plaintiff is complaining about is simply a result of this being a FAR subpart 8.4 procurement with streamlined documentation requirements.  Defendant-Intervenor largely mirrors the government's arguments on these points.

Taking the government's second argument first (as it goes to whether there was error, versus whether any error was prejudicial), the government puts slightly more meat on the bones of this argument in its reply brief asserting that "[a]s this Court has explained, FAR Subpart 8.4 requires minimal 'documentation of any tradeoffs' when the source selection authority chooses between proposals with similar overall ratings."  ECF No. 38 ("Gov. Reply") at 2 (citing *Matt*

*Martin Real Estate Mgmt., LLC v. United States*, 96 Fed. Cl. 106, 116 n.11 (2010)).  In other words, the government's argument is that any failure to document the results of the technical expertise evaluation is not an error because this is a FAR subpart 8.4 procurement and FAR subpart 8.4 procurements require less documentation.[9]

Although the government is correct that FAR subpart 8.4 procurements permit more streamlined documentation than, for instance, FAR part 15 procurements, this streamlined documentation requirement does not get the agency off the hook for the almost complete lack of documentation of its rationale regarding its technical expertise evaluation for at least two reasons.  First, the streamlined or "minimum" documentation required by FAR subpart 8.4 does not mean that the agency can provide almost no rationale for the decisions made on the technical evaluation.  FAR subpart 8.4 is clear on this point.  Second, even if the FAR permitted the level of streamlined documentation the government argues for, effective judicial review under the Tucker Act, applying the APA standard, requires more documentation of the reasoned basis for the agency's decision than was provided here.

The Army's technical expertise evaluations for all three offerors are identical, with one small immaterial difference:[10]

> The Offeror's quotation indicates an adequate understanding of the PWS requirements and deliverables for a rating of "ACCEPTABLE."  The Evaluation Team reviewed and evaluated all of the Offeror's presented PWS paragraphs.  There were zero strengths, zero weaknesses, zero deficiencies, and [no/no/two] comments identified in the Offeror's quotation.  The overall knowledge and experience communicated by the Offeror demonstrates they have adequate knowledge necessary to successfully perform the requirements in the critical PWS paragraphs.

> All PWS sections were reviewed, and if not addressed above, they were determined, at a minimum, to have been adequately covered in the Offeror's quotation.  In summary, the Offeror's quotation indicates an overall acceptable level of understanding of the PWS requirements.  Based on the Offeror's technical

---

[9] Apparently, the government also believes that protests involving FAR subpart 8.4 procurements require less briefing.  As the Court has already observed, and will observe later in this opinion, the government failed to address important aspects of Plaintiff's arguments, as well as two of the four injunctive relief factors.  With regard to this particular FAR subpart 8.4 argument—that FAR subpart 8.4 requires less documentation—the government cited to, or quoted from, FAR subpart 8.4 exactly **zero** times.  *See, e.g.*, Gov.'s MJAR at 15–16 (neither quoting nor citing anything in FAR subpart 8.4 in support of its argument).  The government's table of authorities indicates that it cited to FAR subpart 8.4 five or more times in its opening brief by identifying the location of its citations as "passim" or throughout.  Although FAR subpart 8.4 is mentioned throughout the government's brief, not a single section within the entire subpart is cited or quoted even once, leaving the Court to wonder exactly what the government is referring to in FAR subpart 8.4 (a subpart that contains thirteen sections and seven subsections) that supports the government's argument.  As is discussed in the body of this opinion, FAR subpart 8.4 has clear documentation requirements that the Army did not comply with here.

[10] The Army did make two comments on Tolliver's proposal regarding what were apparently two minor concerns.  *See* AR 480.  These concerns did not affect Tolliver's overall technical expertise rating.

methodology as presented, they have adequate knowledge to provide the services stated in the PWS and exhibit "ACCEPTABLE" technical capabilities with moderate risk of unsuccessful performance to the Government.

AR 478–480.

This incredibly repetitive and completely conclusory five-sentence long summary of the results of the technical expertise evaluation comports with neither FAR subpart 8.4, nor the APA.  First, FAR subpart 8.4 requires, for a BPA like this procurement, that the "contracting officer shall include in the BPA file documentation" of, *inter alia*: 1) "[e]vidence of compliance with paragraph (b) of this section," which requires that the "contracting officer shall ensure all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ"; and 2) the "[b]asis for the award decision[, which] . . . should include the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work."  48 C.F.R. § 8.405-3(a)(7).  There is, however, no evidence in the administrative record demonstrating compliance with paragraph (b) or providing any real rationale for any tradeoffs in making the selection.  With regard to compliance with paragraph (b), the Court simply cannot tell from this administrative record whether all proposals were fairly considered or whether the award was made in accordance with the basis for selection in the RFQ.  In other words, the repetitive and conclusory explanation of the results of the technical evaluation quoted above gives the Court no indication that the quotes were either fairly evaluated or evaluated in accordance with the RFQ, which, for instance, set forth nine paragraphs in the PWS that were deemed by the agency "to be critical."  AR 124.  Moreover, with regard to the basis for the award decision, the Court can neither tell what the evaluation methodology actually was for selecting the awardee nor discern the rationale for the tradeoff analysis, which simply adopted the evaluation team's technical expertise ratings.  Indeed, the technical expertise ratings themselves offer little, to no, rationale for the ratings given, or why no strengths, weaknesses, or deficiencies were awarded.  In short, although FAR subpart 8.4 may create a low bar for documentation, the Army has fallen woefully short of that bar here.

Moreover, rather than directing the Court to any section, subsection, paragraph, or clause in FAR subpart 8.4 that supports its streamlined documentation argument, the government directed the Court to decisions of other judges of this Court in FAR subpart 8.4 bid protests, principally *Matt Martin Real Estate Management LLC v. United States*, 96 Fed. Cl. 106 (2010).  Notably, however, the facts of *Matt Martin* actually support the Plaintiff's position.  Although it is true that *Matt Martin* holds that "[t]he amount of documentation necessary in FAR Subpart 15," it does not hold that the almost non-existent documentation that is present in this protest complies with FAR subpart 8.4.  96 Fed. Cl. at 116.  Thus, rather than help the government, *Matt Martin* provides an example of the type of evaluation and documentation thereof that should be present in a FAR subpart 8.4 procurement:

The TET members rated each proposal independently.  AR Tab 10, at 316.  Once individual TET members completed their individual evaluations, the TET convened to review and compare individual evaluation ratings.  *Id.* at 317.  The TET members

discussed the strengths, weaknesses, significant weaknesses[,] and deficiencies of
each offeror and determined appropriate ratings. *Id.* The TET then completed an
Initial Evaluation devoting twenty-two pages to its analysis of Matt Martin's
proposal. AR Tab 44, at 2248–70. In the Initial Evaluation, the TET identified
Matt Martin's strengths and weaknesses and included a narrative explaining its
basis for each determination. *Id.* The TET then requested revised proposals. AR
Tab 21. In the Revised Evaluation, the TET devoted eight pages to its analysis of
Matt Martin's proposal. AR Tab 43, at 1860–67.

Following the Initial and Revised Evaluations, the TET prepared its Source
Selection Memorandum with ratings of each proposal based on the Solicitation
factors and the Initial and Revised Evaluations. AR Tab 42, at 1702. The TET
submitted the Source Selection Memorandum, its Initial Evaluations and its
Revised Evaluations to the SSO. *Id.*

96 Fed. Cl. at 115–16. Simply put, the documentation in the government's principal case in
support of its streamlined documentation argument far exceeded the mere five-sentence long,
conclusory explanation present in this protest.

Beyond violating the even minimal documentation requirements of FAR subpart 8.4, the
Army insufficiently documented its technical expertise evaluation for purposes of the APA
standard of review this Court applies in a bid protest. It is axiomatic "that an agency must
explain its action with sufficient clarity to permit 'effective judicial review.' Failure to provide
the necessary clarity for judicial review requires the agency action be vacated." *Timken U.S.
Corp.*, 421 F.3d at 1355 (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). "Specifically,
the agency must articulate the reasons for its procurement decision including a rational
connection between the facts found and the choice made." *Lab'y Corp. of Am. Holdings*, 116
Fed. Cl. at 652 (citing *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 377 (2012)); *see
also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43
(1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation
for its action including a rational connection between the facts found and the choice made."
(internal quotations and citation omitted)). Here, the administrative record does not provide a
satisfactory explanation for the Army's technical evaluation of the offerors' proposals. In other
words, the Army—to harken back to grade school math—forgot to show its work. But the
Court's task is to determine whether the Army "considered the relevant factors and articulated a
rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v.
NRDC*, 462 U.S. 87, 105 (1983) (citation omitted). The record before the Court does not allow it
to make that determination.

The government additionally argues that Plaintiff has not demonstrated that it was
prejudiced by this complete failure of the Army to demonstrate that it conducted a rational
technical expertise evaluation. The government's argument is without merit. According to the
government, in order to demonstrate prejudice, Plaintiff was supposed to prove not only that the
government's failure to conduct a technical evaluation and thus trade-off analysis (thereby
converting this best value procurement into a lowest price, technically acceptable procurement)
was in error, but also that there were strengths Plaintiff was supposed to be awarded that it did

not receive.  The government's argument misses the mark.  First, Plaintiff alleged in its complaint that it would have received eleven strengths, *see* Compl. Ex. 4, and reasserted that argument, albeit without great detail, in its MJAR, Pl.'s MJAR at 25.  But what Plaintiff is really arguing here is not that it should have received additional strengths—it is arguing that the Army completely failed to document its technical evaluation and its rationale for not awarding any strengths, weaknesses, or deficiencies.  By so doing, according to Plaintiff, the Army impermissibly turned a best value procurement into a lowest price, technically acceptable procurement.  *See* 48 C.F.R. § 8.405-3(b)(2)(viii) ("The ordering activity contracting officer shall establish the BPA with the schedule contractor(s) that represents the best value.").

The prejudice to Plaintiff of converting this procurement from best value to lowest price, technically acceptable is obvious.  For instance, the pricing for the level of effort and expertise that satisfies technical acceptability is likely substantially lower than the pricing of the level of effort and expertise needed to compete for a best value award.  If Plaintiff were aware of the playing field it was playing on, it likely would have submitted a substantially different pricing proposal potentially making its proposed prices more in line with those of the other two offerors.  Conversely, if the agency had actually evaluated the technical expertise presented in the proposals, which it did not according to the record information before the Court, it is likely that Plaintiff may have received strengths or that the other offerors may have received weaknesses that would have affected the best value analysis.  Instead, the agency erred by essentially ignoring its obligation to conduct a technical expertise evaluation and thereby significantly elevating the relative importance of price in its best-value tradeoff analysis.  This error prejudiced Plaintiff.

### 4.  Plaintiff Failed to Demonstrate Standing to Protest the Evaluation of the Risk Management and Mitigation factor

Finally, Plaintiff argues that the agency's evaluation of Risk Mitigation and Management was unreasonable because "the Army entirely failed to consider an important aspect of the problem – Tolliver's ability to obtain and retain qualified personnel."  Compl. ¶ 58.  However, the Court need not reach the merits because Plaintiff has failed to sufficiently plead that it has standing to challenge this aspect of the evaluation.  Nowhere in Plaintiff's complaint did it allege *how* it was prejudiced by the agency's alleged error in evaluating Tolliver's proposal under the Risk Mitigation and Management factor.  Rather, Plaintiff simply states that it "was prejudiced by the arbitrary evaluation of Risk Mitigation and Management."  *Id.* ¶ 59.  That may be, but proper pleading of prejudice for standing purposes requires more than just this conclusion.  The next paragraph of the amended complaint may offer a little more of a clue as to what Plaintiff's prejudice might be: "because the evaluators failed to consider Tolliver's ability to obtain and retain qualified personnel in light of Tolliver proposing wages that were drastically lower than historically paid, Count V should be sustained, and the relief granted as requested."  *Id.* ¶ 60.  While this sentence is slightly more illuminating as to prejudice—as in, maybe what Plaintiff is alleging is that Tolliver's proposed prices were artificially low and if they were higher Plaintiff would have had a substantial chance of award—it still does not, if fact, allege how Plaintiff was prejudiced.  For instance, did Plaintiff increase its prices in anticipation of the evaluation of Risk Mitigation and Management factor?  The Court does not know whether that is the alleged prejudice because Plaintiff did not plead it.

Moreover, it is not clear from Plaintiff's complaint or its MJAR that this is what it is actually asserting caused it prejudice. Rather, it appears from those documents that it seems to be arguing that Tolliver should have received a weakness under the Risk Mitigation and Management factor because it was questionable, according to Plaintiff, whether Tolliver had the "ability to obtain and retain qualified personnel." Pl.'s MJAR at 31. The "ability to obtain and retain qualified personnel" sounds more like an argument regarding weaknesses or deficiencies than price. But Plaintiff makes no allegation as to how Tolliver receiving a weakness would have affected Plaintiff. This discussion is an example of why the Court, in all but the most obvious cases, cannot, on behalf of a protestor, surmise the prejudice the protestor allegedly suffered as a result of a procurement error. It was Plaintiff's obligation to plead some sort of allegation as to how exactly a failure to properly evaluate Tolliver under this factor affected Plaintiff.

Furthermore, to any extent that the prejudice caused by this alleged error is obvious, the Court believes that this potential prejudicial effect is already covered by the price realism analysis that the agency will be required to rationally conduct if it chooses to go forward with this procurement. In other words, although the prejudice for pricing-error allegations in procurements in which price is the deciding factor may generally be obvious, because the Court has already determined the price realism evaluation was in error, Plaintiff needed to allege more here for this seemingly cumulative argument (if in fact this was Plaintiff's argument) in order to demonstrate prejudice. Because Plaintiff failed to allege how it was prejudiced by the agency's alleged error with regard to its evaluation of the Risk Mitigation and Management factor, Plaintiff lacks standing to challenge this aspect of the agency's evaluation.

## D.  Injunctive Relief

As the Court has determined that the Army's award of the contract to Tolliver was unreasonable and that Plaintiff was prejudiced by the agency's error, the Court now turns to the question of whether Plaintiff is entitled to injunctive relief. The Federal Circuit has articulated a four-part test for the issuance of a permanent injunction as follows:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). Because Plaintiff has succeeded on the merits of its protest, the Court turns to the three remaining injunctive relief factors.

### 1.  Irreparable Harm

With respect to irreparable harm, the pertinent question is "whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl.

446, 447 (1993); *see also Younger v. Harris*, 401 U.S. 37, 43–44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"). Plaintiff asserts that it will be harmed absent the issuance of an injunction because the only other available relief—recoupment of bid preparation costs—would not remedy its lost opportunity to fairly compete for the contract.

In response, the government once again skips over Plaintiff's argument and argues instead that Plaintiff has not suffered irreparable harm because Plaintiff has not demonstrated that it was prejudiced by any alleged errors. Gov.'s Cross MJAR at 18. However, as explained above regarding the merits of the two errors upon which Plaintiff prevailed, Plaintiff was prejudiced by the Army's errors. Moreover, "[t]his court has recognized that a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 619 (2020) (citing *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009)); *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)); *see also CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501–02 (2008) (noting that because "the only other available relief—the potential for recovery of bid preparation costs—would not compensate [the protestors] for the loss of valuable business on the [contract]. This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm"). Accordingly, Plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### 2. Balance of Hardships

In addition to considering whether a protestor would suffer an irreparable injury absent injunctive relief, the Court must determine whether the balance of hardships to the government and Defendant-Intervenor in issuing an injunction outweigh the harms to Plaintiff. *PGBA, LLC*, 389 F.3d at 1229. Here, Plaintiff has established irreparable harm, as explained above. Furthermore, Plaintiff argues that the government would not be harmed beyond the "the garden-variety costs and delays that may result from this Court's issuance of a preliminary injunction." ECF No. 4 at 21 (citing *Univ. Rsch. Co., LLC v. United States*, 65 Fed. Cl. 500, 514 (Fed. Cl. 2005) (finding that the costs and inconvenience associated with the delay in transition caused by the issuance of a preliminary injunction were typical of the costs and inconveniences that face almost every new contractor seeking to unseat an incumbent contractor and did not outweigh the imminent harm to plaintiff)).

Astonishingly, the government provided *no* actual response to Plaintiff's argument.[11] The Court is bewildered by the lack of response to this injunctive relief criteria.[12] It is difficult

---

[11] Defendant-Intervenor also did not point to any hardships it would suffer due to this Court's issuance of an injunction in this case. *See* ECF No. 32 at 28–29.

[12] The sum total of the government's response on the hardship and public interest factors was as follows: "[l]ikewise, as acknowledged in DigiFlight's motion, the hardship and public interest factors

for the Court to discern whether the government's failure to respond is because the government believes that it will not suffer any harm if an injunction is issued or if it is the result of overconfidence regarding the strength of its positions on the merits.[13]  Coincidently, it is similarly difficult for the Court to "balance" hardships when the government could not be bothered to assert what, if any, hardships it will suffer if an injunction is issued.  Thus, the Court will presume that Plaintiff was correct in asserting that the government would not be harmed beyond the costs and delays that typically result from the issuance of an injunction.[14]

### 3.  Public Interest

Turning to the final factor, the Court finds that issuing a permanent injunction will serve the public interest.  The Supreme Court has instructed that before a court "employ[s] the extraordinary remedy of injunction," it "should pay particular regard for the public consequences" of so doing.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  It is beyond dispute that "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 586 (2010) (citation and internal quotation marks omitted), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).  Moreover, "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *PGBA, LLC*, 57 Fed. Cl. at 663.  It is paramount that a procuring agency abide by the terms of its solicitation and the FAR in order to maintain public confidence in the procurement process.  This was not done here and, to any extent that this general rule or some other reasons weigh against Plaintiff on this factor, the government, as with the hardship factor, could not be bothered with addressing Plaintiff's argument.  Accordingly, this factor likewise weighs in Plaintiff's favor.

### 4.  Weighing of the Factors

In addition to prevailing on the merits of its protest, Plaintiff has established that it will suffer irreparable harm if the Court does not provide injunctive relief, that the balance of harms turns in its favor, and that awarding injunctive relief is clearly in the public interest. Accordingly, the issuance of a permanent injunction is warranted.

---

often coalesce around the merits in bid protests.  Pl.'s Mot. at 38 (citations omitted).  As such, these factors also weigh against injunctive relief."  Gov.'s Cross MJAR at 17–18.  First, the Court does not see anything that resembles Plaintiff "acknowledg[ing] . . . the hardship and public interest factors often coalesce[ing] around the merits" on page 38 of Plaintiff's motion such that the government is somehow responding to what Plaintiff argues regarding these two factors.  Second, and more importantly, these two sentences (falsely bolstered by a phantom citation to a non-existent argument in Plaintiff's motion) are conclusory.  Simply put, "these factors also weigh against injunctive relief" is not a responsive argument.

[13] If it is the latter, this would be an even odder position to take considering the government failed to even respond to Plaintiff's main argument regarding price realism.

[14] And even if this presumption is incorrect, the factor nonetheless weighs in Plaintiff's favor as a matter of waiver.  *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

## CONCLUSION

For the reasons set forth above, counts II and V of Plaintiff's complaint are **DISMISSED** for lack of subject matter jurisdiction; the Court **GRANTS** Plaintiff's motion for judgment on the administrative record as to the remaining counts in its complaint; and **DENIES** the government's and Defendant-Intervenor's cross-motions.  Additionally, the Court orders that:

1. The United States, including the Department of the Army, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining, or continuing to obtain, performance from Tolliver on the task order awarded to Tolliver pursuant to the RFQ at issue in this protest;

2. Furthermore, the United States, including the Department of the Army, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from awarding a task order under the RFQ at issue in this protest or allowing any contractor to perform under any task order under the RFQ at issue in this protest until a price realism analysis, technical expertise evaluation, and best value trade-off analysis are performed in a manner that is not inconsistent with this opinion; and

3. The Clerk shall **ENTER** final judgement accordingly.

**IT IS SO ORDERED.**

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge